## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**EVAN MOORE,**
        Plaintiff,

vs.                                                     No. 1:13-cv-00756-JAP/SMV

**ALBUQUERQUE FIRE MARSHAL**
**LIEUTENANT SHANE TURPEN**
**AND SAFE CITY STRIKE FORCE**
**OFFICER JOE MARTINEZ,**
        Defendants.

### MEMORANDUM OPINION AND ORDER

On January 28, 2014, Defendants Joseph Martinez and Shane Turpen (Defendants) filed a motion asserting qualified immunity and asking the Court to grant summary judgment in Defendants' favor on Plaintiff's civil rights claims. *See* DEFENDANTS' MOTION AND MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT REQUESTING DISMISSAL OF PLAINTIFF'S COMPLAINT ON QUALIFIED IMMUNITY GROUNDS (Doc. No. 21) (Motion). Plaintiff opposes the Motion. *See* PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION AND MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARRY [sic] JUDGEMENT [sic] REQUESTING DISMISSAL OF PLAINTIFF'S COMPLAINT ON QUALIIFED IMMUNITY GROUNDS (Doc. No. 32) (Response). After a careful review of the pertinent law, exhibits, and briefing, including DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT REQUESTING DISMISSAL OF PLAINTIFF'S COMPLAINT ON QUALIFIED IMMUNITY GROUNDS (Doc. No. 34) (Reply), the Court will grant Defendants' motion for summary judgment on Plaintiff's due process claim and will deny Defendants' motion for summary judgment on Plaintiff's unlawful search and malicious prosecution claims.

1

# BACKGROUND

## I.      The Parties

Defendant Joseph Martinez (Officer Martinez) is the Deputy Director of the Albuquerque

Safe City Strike Force. Affidavit of Joseph Martinez, Exhibit A to Motion (Doc. No. 21-1)

(Martinez Affidavit) ¶ 4. As director of the Safe City Strike Force, it is his duty to enforce

Albuquerque's codes and ordinances, including the city housing code. *Id.* In so doing, Officer

Martinez works closely with the Albuquerque Fire Marshall's Office. *Id.* Defendant Shane

Turpen (Lieutenant Turpen) was working as a Fire Marshall Inspector at the time of the October

28, 2011 incident giving rise to this lawsuit. Affidavit of Shane Turpen, Exhibit B to Motion

(Doc. No. 21-1) (Turpen Affidavit) ¶ 6. Fire Marshall Inspectors are "responsible for

determining whether business[es] and citizens comply with the Fire Code." *Id.* ¶ 4.

Plaintiff Evan Moore is a Senior Fire Fighter with the Bureau of Land Management.

Affidavit of Evan Moore, Exhibit 1 to Response (Doc. No. 32-1) (Moore Affidavit) ¶ 3. On

October 28, 2011, Plaintiff owned and operated an art gallery located in downtown Albuquerque,

New Mexico. *Id.* ¶ 5.

## II.     The Night of October 28, 2011

The following facts are undisputed. On October 28, 2011, at approximately 11:45 p.m.,

Officer Martinez, Lieutenant Turpen, and an unknown number of police officers arrived at

Plaintiff's art gallery, where Plaintiff was hosting a Halloween-themed promotional event.

Turpen Affidavit ¶¶ 14-15. Officer Martinez and Lieutenant Turpen heard music coming from

the building and saw people standing outside the entrance to the building. *Id.* ¶ 15. Officer

Martinez and Lieutenant Turpen approached Plaintiff, who was standing outside the building,

and asked for his identification. *Id.* ¶ 17. Lieutenant Turpen then "told Plaintiff that they were

going to inspect the business." *Id.* ¶ 18. After this exchange, Defendants entered the building. *Id.* ¶ 25. One of the unnamed police officers followed Plaintiff upstairs to get Plaintiff's identification from his second-floor residence. Moore Affidavit ¶¶ 21, 28-30.

Not long thereafter, Defendants turned off the music, turned on the lights, and ordered all of Plaintiff's patrons to leave. *Id.* ¶ 35; *see also* Video of Inspection, Exhibit D to Motion. Defendants proceeded to inspect Plaintiff's gallery. During this time period, Lieutenant Turpen identified what he believed to be various fire code violations: improper use of the building to host an assembly and haunted house, lack of clearance for the ignition to the water heater, improper wiring, improper use of extension cords, lack of appropriate fire barriers in the ceilings, improperly marked doors and manners of egress, improper decorations, and failure to service fire extinguishers. Turpen Affidavit ¶¶ 26-28, 30-32, 34-35, 42, 44.

At some point during the inspection, Lieutenant Turpen asked Plaintiff what was upstairs. *Id.* ¶ 37. Plaintiff informed Lieutenant Turpen that it was his personal residence. *Id.* ¶ 38. Despite this information, Defendants proceeded to inspect Plaintiff's residence, taking both videotape and photographs of the interior of the living area. *Id.* ¶¶ 39-41; Videotape of Inspection, Exhibit D to Motion; Photographs, Exhibits E-1 through E-5 to Motion (Doc. No. 21-2).

At the conclusion of the inspection, "[t]he building was posted as substandard." Turpen Affidavit ¶ 44. Defendants allowed Plaintiff to remain in the building that night, but told Plaintiff that he would need to find another home. Moore Affidavit ¶¶ 56, 58. In addition, Officer Martinez issued a criminal citation against Plaintiff for holding a dance without a proper permit. Martinez Affidavit ¶ 18.

### III.     Plaintiff's Complaint

On June 25, 2013, Plaintiff filed a complaint in the Second Judicial District Court for the State of New Mexico. *See* COMPLAINT TO RECOVER DAMAGES FOR DEPRIVATION OF CIVIL RIGHTS, Exhibit A to NOTICE OF REMOVAL (Doc. No. 1-2) (Complaint). Plaintiff's complaint asserts three claims: a Fourth Amendment unlawful search claim, a Fourteenth Amendment due process claim, and a malicious abuse of process claim. *Id.*

### DISCUSSION

### I.     Standard of Review

Qualified immunity protects government officials who are required to exercise their discretion by shielding them from liability for harm caused by reasonable mistakes. *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009). When a defendant asserts qualified immunity at the summary judgment stage, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right, and (2) the constitutional right was clearly established at the time of defendant's conduct. *Courtney v. Okla. ex rel. Dep't of Pub. Safety*, 722 F.3d 1216, 1222 (10th Cir. 2013). If a "plaintiff successfully carries his two-part burden," the "defendant bears the burden, as an ordinary movant for summary judgment, of showing no material issues of fact remain that would defeat the claim of qualified immunity." *Estate of Booker v. Gomez*, 745 F.3d  405, 2014 WL 929157, at *3 (10th Cir. 2014) (citations omitted).

A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Courtney*, 722 F.3d at 1222. Under Supreme Court and Tenth Circuit decisions, a law is not clearly established unless existing precedent places the right in question "beyond debate." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011). Nonetheless, qualified immunity analysis is not a "scavenger hunt for prior cases with precisely

the same facts." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004).  To prevail against a defendant's assertion of qualified immunity, the plaintiff need not identify a case holding the exact conduct in question unlawful.  The focus is whether the law at the time of the defendant's conduct provided the defendant with "fair notice" regarding the legality of his conduct. *Id.*

In determining whether the plaintiff has met his burden of establishing a clearly established constitutional violation, the Court "will construe the facts in the light most favorable to the plaintiff as the nonmoving party."  *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009) (citation omitted).

## II.    Fourth Amendment

Plaintiff first contends that Lieutenant Turpen's and Officer Martinez's conduct constituted a warrantless search of his home and business in violation of the Fourth Amendment. To overcome Defendants' assertion of qualified immunity, Plaintiff must show (1) Defendants performed an unconstitutional search of Plaintiff's home and business, and (2) it would have been clear to a reasonable officer in Defendants' position that their conduct was illegal. Here, it is undisputed that Lieutenant Turpen and Officer Martinez entered Plaintiff's home and business on the night of October 28, 2011 without obtaining a warrant. However, the parties disagree about whether (1) Defendants' entrance constituted a search under the meaning of the Fourth Amendment, (2) Plaintiff consented to the entrance, and (3) Defendants' conduct was reasonable in light of the circumstances.

### A.  The Existence of a Search

The protections of the Fourth Amendment only extend to government searches and seizures. *See* U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. .

."). A search occurs within the meaning of the Fourth Amendment when the government intrudes upon an individual's reasonable expectation of privacy. A court determines whether government conduct constitutes a search by making two inquires: "first has the person exhibited a subjective expectation of privacy in the place or thing searched? [s]econd, is the person's expectation of privacy one that society is prepared to recognize as reasonable?" *United States v. Hatfield*, 333 F.3d 1189, 1195 (10th Cir. 2003) (internal citations omitted).

"[I]t is axiomatic that people have a reasonable expectation of privacy in their own homes." *United States v. Maestas*, 639 F.3d 1032, 1035 (10th Cir. 2011). However, the same cannot be said of a public business. There is no reasonable expectation of privacy in the areas of a commercial establishment "where the public [i]s invited to enter and to transact business." *Maryland v. Macon*, 472 U.S. 463, 469 (1985); *Abilene Retail # 30, Inc. v. Bd. of Comm'rs*, 492 F.3d 1164, 1179 (10th Cir. 2007) ("There is no barrier to officers entering any retail establishment during normal business hours to view those areas of the premises open to the public."). Officers may observe or inspect a commercial business without a warrant and without running afoul of the Fourth Amendment as long as they remain in areas of the business open to the public and behave in a manner consistent with the business's invitation to the public.

However, if an officer "exceed[s] the limits of consent afforded the general public in the premises, the Fourth Amendment will be violated." *Kozel v. Duncan*, 421 F. App'x 843, 850 (10th Cir. 2011) (citing *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 329 (1979)). For example, in *Kozel*, the Tenth Circuit held that officers "searched" a dance club and pool hall when they entered the club, turned the lights on, shut the music off, and lined up the patrons for a sobriety check. *Id.* at 845, 850. In *Kozel*, the Tenth Circuit cites with approval *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 196-97 (5th Cir. 2009), a case where the Fifth Circuit held that law

6

enforcement officers exceeded the scope of a nightclub's public invitation by entering a club with drawn weapons and searching the club, its attic and a separate apartment. *Id.* at 850. Like the present case, the law enforcement officials in *Club Retro* were looking for, among other things, evidence of fire code violations.

The facts of this case are strikingly similar to the facts of *Kozel*. Defendants, Lieutenant Turpen and Officer Martinez, entered Plaintiff's art gallery accompanied by other law enforcement personnel. After perusing the establishment, Defendants turned on the lights and instructed the D.J. to stop the music. Defendants then told all of Plaintiff's patrons to go home. In so doing, Defendants did not observe the art gallery as ordinary customers would. Like in *Kozel*, Defendants' inspection of Plaintiff's business became a search the moment Defendants interrupted Plaintiff's event. Furthermore, given the existence of *Kozel*, it should have been clear to reasonable officers in Defendants' position that their behavior constituted a search under the Fourth Amendment.

Although it is not crucial to Plaintiff's claim, the Court observes that Defendants' initial decision to enter the art gallery and walk around cannot be labeled a search. Plaintiff admits that he was hosting a Halloween-themed promotional event for his commercial art gallery on the night of October 28, 2011. Moore Affidavit ¶¶ 5-6, 9; Complaint ¶ 7. Plaintiff's Complaint states that he "sent out advertisements about the event and had also hosted similarly themed events in the days prior." Complaint ¶ 8. The nature of these advertisements is somewhat unclear; Plaintiff's affidavit states that he "did not promote the function as public on facebook" and that all of his "patrons came because they were invited not because of public advertising." Moore Affidavit ¶ 11. Nevertheless, Plaintiff agrees that he was charging admission, Response at 3, and Plaintiff does not appear to dispute that his gallery was open to members of the public.

Defendants did not encroach on an area of privacy protected by the Fourth Amendment simply by entering the area of Plaintiff's business open to the public and viewing this area of the business as members of the public.

Defendants' failure to pay the required admission fee does not alter this analysis. In *Kozel*, the Tenth Circuit rejected the argument that the Fourth Amendment requires police officers to pay an admission fee before entering a public event. The Court stated that "payment of an entry fee is generally not relevant to the Fourth Amendment analysis." *Kozel*, 421 F. App'x at 850 (10th Cir. 2011). It was Defendants' decision to end Plaintiff's event, not Defendants' refusal to pay the admission fee, which transformed Defendants' inspection of Plaintiff's business into a search under the Fourth Amendment.

Plaintiff also asserts a Fourth Amendment claim based on Defendants' examination of Plaintiff's residence, a loft area on the second floor of the same building. There can be no debate that Defendants' decision to enter an area they knew to be Plaintiff's home was a search under the Fourth Amendment. *See Hatfield*, 333 F.3d at 1195 ("The prototypical area of protected privacy is the interior of a home.") (internal citation omitted). Defendants do not cite to any case law supporting their contention that an inspection of an individual's private residence is not a search if it is "part and parcel" of the inspection of an adjoining business. Motion at 10. Indeed, Supreme Court precedent clearly forecloses this argument; it is well-established that a business owner has a reasonable expectation of privacy in areas from which the public has been excluded, even when these areas are not being used a private residence. *United States v. Dunn*, 480 U.S. 294, 316 (1987). In other words, law enforcement officials are not empowered to conduct a general search "whenever entry is obtained by invitation and the locus is characterized as a place of business." *Lewis v. United States*, 385 U.S. 206, 211 (1966).

Nor is there sufficient evidence for the Court to conclude as a matter of law that Plaintiff had opened his residence to the public by inviting the customers onto the second floor. Defendants claim that the video shows Plaintiff's patrons "congregating the upper floor," but the Court was not able to identify this portion of video, which was at times quite dark, simply by watching the video without the assistance of a pin-cite. As a result, the Court could not form a first-hand opinion about the situation. Even if it had, Plaintiff has presented evidence disputing Defendants' contention that a reasonable officer could conclude the second floor was open to the public. According to Plaintiff, he "had physically blocked" the two entrances to his residence, turned out the lights, and locked the doors. Moore Affidavit ¶¶ 41-42. Because Plaintiff has produced evidence from which a reasonable fact-finder could conclude that no reasonable officer would have thought Plaintiff's personal residence was open to the public, the Court cannot grant summary judgment in favor of Defendants on Plaintiff's claim that Defendants searched his home in violation of the Fourth Amendment.

Moreover, even if there was no factual dispute concerning what parts of Plaintiff's building were open to the public, for the reasons previously discussed, it is clear that Defendants' conduct during the time period after the closure of Plaintiff's event, including the inspection of Plaintiff's residence, constituted a search. Based on *Kozel*, a case issued prior to the search of Plaintiff's gallery and residence, it should have been clear to Defendants that their actions were governed by the Fourth Amendment standards applicable to searches. Therefore, the Court finds that Defendants are not entitled to qualified immunity on this particular issue.

### B.  Consent

Defendants next contend that Plaintiff's Fourth Amendment claim fails because Plaintiff assented to the search of his home and business, a fact Plaintiff disavows. When there is a

dispute concerning consent, a court evaluates the issue using an objective reasonableness standard: the question is whether a reasonable law enforcement officer in Defendants' position would have understood that Plaintiff consented to the search. *United States v. Flores*, 48 F.3d 467, 468-469 (10th Cir. 1995). Additionally, to be valid, consent must be voluntary. *Id.* at 469. In other words, the constitutionality of a consent-based search depends upon whether the consent was "unequivocal and specific . . . freely and intelligently given . . . without duress or coercion." *United States v. Benitez*, 899 F.2d 995, 998 (10th Cir. 1990). It is well-settled that "an individual's mere acquiescence to a claim of lawful authority is not, by itself, enough to show voluntary consent." *Camfield v. City of Okla. City*, 248 F.3d 1214, 1233 (10th Cir. 2001). Likewise, "voluntary consent cannot be based on a misrepresentation of lawful authority." *Id.*

　　At this stage of the proceedings, it is clear that there is a genuine factual dispute about whether Plaintiff provided "unequivocal and specific" consent to the search. Although Lieutenant Turpen and Officer Martinez both testified that Plaintiff "allowed the inspection,"[1] Plaintiff flatly denies consenting to Defendants entering the gallery, turning off the music, stopping the lights, closing the event, and entering his personal residence. Moore Affidavit ¶¶ 19-22, 26, 30-32, 39-41. Defendants ask the Court to resolve this factual disagreement by watching the video provided by Defendants. Quite frankly, this video is not very helpful. The

---

[1] Defendants' affidavits alone raise doubts about the consensual nature of the search. Officer Martinez described the encounter as follows: "Lt. Turpen and I approached Plaintiff and asked him for his identification. Lt. Turpen told Plaintiff that they were going to inspect the business. Plaintiff allowed the inspection." Martinez Affidavit ¶¶ 10-12. Lieutenant Turpen testified that: "Mr. Martinez and I approached Plaintiff and asked him for his identification. I told Plaintiff that they were going to inspect the business. The police escorts did not pull their weapons. Plaintiff was not threatened by Defendants or their police escorts. Mr. Moore was not mistreated and no force was used against him. I did not witness any signs that would call into question whether Mr. Moore had any debilitating mental condition. Plaintiff allowed the inspection. Plaintiff's consent to the inspection of both the lower and upper floors was clear and unequivocal based on his actions." Turpen Affidavit ¶¶ 17-24. Both Defendants agree that Lieutenant Turpen "told" Plaintiff that Defendants would be inspecting his business, rather than requesting an inspection. A reasonable juror could conclude that Defendants made a claim of authority and demanded to inspect Plaintiff's business in such a manner that a reasonable person would not have felt free to resist the search.

quality of the picture is very dark, and the Court is not familiar with the voices or appearances of the parties in this case. As a result, the Court is not able to identify the figures in the video or determine how many law enforcement officers were present at the scene. Most significantly, aside from a short portion at the beginning of the video that both parties describe as an exchange between Plaintiff and Defendants, it is not apparent where Plaintiff is or what he is doing. Plaintiff's apparent absence from large portions of the video prevents this Court from drawing any conclusions about whether Plaintiff's statements or conduct evidenced consent to the search.

If anything, the video supports Plaintiff's claim that he objected to Defendants entrance into his gallery and his residence. The video records an unidentified individual, presumably Lieutenant Turpen, approaching Plaintiff and asking for his identification.[2] Video of Inspection, Exhibit D to Motion at 1:45. At that point, Plaintiff offered to go inside and retrieve his license, to which Lieutenant Turpen replied "I want you to take an officer with you." Plaintiff objected, saying: "I'm going to go by myself and come back down." Lieutenant Turpen immediately stated: "No, we're going to go with you and we're going to be walking in right now, that's how it goes okay. . . First of all, you don't have a permit for this party, okay . . . So, uh, at this point, we're going to be closing the party down." Plaintiff then asked what the violation was. Lieutenant Turpen's response is largely inaudible, but he does say the words "fire permit." *Id.* at 1:50-2:15. Shortly thereafter, Plaintiff exits the range of the video camera.

Based on the video and audio evidence of this conversation, there is sufficient evidence for a reasonable fact-finder to conclude that Defendants asserted a claim of authority to enter Plaintiff's gallery and close the event over Plaintiff's objection. Plaintiff's acquiescence to this assertion does not equate to consent.

---

[2] The Court is assuming that the persons talking in the video are Plaintiff and Lieutenant Turpen because all parties agree that Lieutenant Turpen approached Plaintiff outside the gallery and asked for his identification.

11

Furthermore, the Court concludes that Plaintiff has produced sufficient evidence to preclude granting summary judgment in favor of Defendants on the basis of qualified immunity. Viewing the facts in the light most favorable to Plaintiff, no reasonable officer would have concluded that Plaintiff consented to the closing of his promotional event, the subsequent search of his gallery, or the search of his private residence. According to Plaintiff, he initially objected to having an officer follow him into his gallery. Moore Affidavit ¶¶ 19, 21. This is corroborated by the video. Plaintiff further testified that this officer stopped Plaintiff from returning to the gallery. *Id.* ¶¶ 28-30. If Plaintiff is to be believed, at this time, while Plaintiff was absent, Defendants turned on the lights, turned off the music, and told everyone to leave. *Id.* ¶ 35. Defendants then proceeded to search the gallery and Plaintiff's second-floor residence.

In his affidavit, Plaintiff denies consenting to either the search of his business or his residence. *Id.* ¶¶ 39-41, 48. Plaintiff specifically explains that he had locked his residence and barricaded both entrances prior to Defendants' search. *Id.* ¶¶ 32, 34, 41-42. In addition, Plaintiff testified that none of the officers present at the scene ever informed him of their intent to enter his private residence during the search or of their plans to videotape and photograph the interior of the residence. *Id.* ¶ 48.

Despite these facts, Defendants argue that it was not clear that Plaintiff objected to the search due to Plaintiff's "silence" and Defendants' perception that Plaintiff failed to protest the inspection after Defendants entered the gallery. In other words, Defendants ask the Court to hold that Defendants are entitled to qualified immunity based on a characterization of the facts favorable to Defendants. The Court is barred from taking this approach; at this stage in the proceedings, the Court must view the evidence in the light most favorable to Plaintiff, the party opposing summary judgment. The evidence presented by Plaintiff refutes Defendants' claim that

Plaintiff placidly accepted Defendants' decision to search Plaintiff's gallery and residence. According to Plaintiff, he objected to Defendants entry and repeatedly asked what legal basis Defendants had to conduct a search. *Id.* ¶ 44.

Furthermore, to the extent Plaintiff was silent, the Court rejects Defendants' contention that a reasonable officer could have interpreted this silence as evidence of consent. Defendants cite *United States v. Patten*, 183 F.3d 1190 (10th Cir. 1999), for the proposition that an individual's "silence and acquiescence may support a finding of voluntary consent." *Id.* at 1194. Defendants' reliance on *Patten* is misplaced. *Patten*, like other cases where the Tenth Circuit has inferred consent from silence, involves a police officer asking a defendant to search a particular area, such as a suitcase or the trunk of the car, and the defendant demonstrating non-verbal consent by proceeding to open or unlock the area to be searched. *Id.*; *United States v. Gordon*, 173 F.3d 761, 766 (10th Cir. 1999) (handing an officer a key constituted non-verbal, voluntary consent to search a locked bag); *United States v. Flores*, 48 F.3d 467, 469 (10th Cir. 1995) ("[W]e find that Armendariz's conclusion that defendant's reopening of the trunk indicated her voluntary consent to a continuation of the search was reasonable."); *United States v. Benitez*, 899 F.2d 995, 998-999 (10th Cir. 1990) (affirming district court decision that appellant consented to a search of his trunk, where appellant voluntarily opened the trunk in response to an officer's request). In all of these cases, the Court inferred consent because the individual's silence was accompanied by affirmative conduct that facilitated a search.

It is obvious that silence cannot equal consent when (1) the individual is not present at the time of the search or (2) the individual has no warning that a search is about to occur. In either case, there is no reasonable basis for concluding that there is any agreement or act of volition on the part of the individual who is subjected to the search. Because Plaintiff has testified that this is

what occurred on the night of October 28, 2011, the Court cannot grant summary judgment in favor Defendants. There is a genuine dispute of material fact that affects whether Defendants are entitled to qualified immunity on the issue of consent.

### C.  Reasonableness

"It is well-established that a warrantless search is presumptively unreasonable under the Fourth Amendment and therefore invalid unless it falls within a specific exception to the warrant requirement." *Roska v. Peterson*, 328 F.3d 1230, 1240 (10th Cir. 2003). Here, Defendants maintain that their search of Plaintiff's gallery qualifies for such an exception because it was a reasonable administrative inspection. Plaintiff disagrees.

### i.      What was the Nature of Defendants' Search?

Ordinarily, a government agent must obtain a warrant prior to searching the nonpublic areas of a business, even if the purpose of the search is regulatory. *See New York v. Burger*, 482 U.S. 691, 699-700 (1987) ("An owner or operator of a business . . . has an expectation of privacy in commercial property, which society is prepared to consider to be reasonable. . . This expectation exists not only with respect to traditional police searches conducted for the gathering of criminal evidence but also with respect to administrative inspections designed to enforce regulatory statutes."); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978) (holding that a statute authorizing warrantless OSHA inspections was unconstitutional because "warrantless searches are generally unreasonable, and . . . this rule applies to commercial premises as well as homes.").

There is, however, an exception for warrantless administrative searches of closely

14

regulated businesses:[3] such searches may be reasonable under the Fourth Amendment if they are

conducted in accordance with a comprehensive regulatory scheme. *Burger*, 482 U.S. at 702;

*Donovan v. Dewey*, 452 U.S. 594, 597 (1981) ("[T]he assurance of regularity provided by a

warrant may be unnecessary under certain inspection schemes."). As the Tenth Circuit has

explained, "the justification for permitting warrantless searches is that persons doing business in

closely regulated industries have a significantly reduced expectation of privacy." *United States v.*

*Seslar*, 996 F.2d 1058, 1061 (10th Cir. 1993). Other circuit courts have reasoned that the "closely

regulated business" exception is grounded in a theory of implied consent: "those entering a

heavily regulated field do so with the knowledge that their establishments may be subject to

warrantless searches." *Bionic Auto Parts & Sales v. Fahner*, 721 F.2d 1072, 1079 (7th Cir.

1983). In other words, the existence of a regulatory scheme, and the reduced privacy it entails,

are critical to the "closely regulated business" exception.

      Here, Defendants have not identified any statute or ordinance from which the Court could

infer that art galleries are subject to pervasive state or federal regulation. As a result, it is clear

that Defendants' conduct does not qualify as a search of a closely regulated business. *Burger*,

482 U.S. at 701 (explaining that the administrative search exception "is essentially defined by the

pervasiveness and regularity of the federal regulation"). In fact, Defendants never directly

address this issue; Defendants avoid all discussion of the warrant requirement and its exceptions.

Instead, Defendants cite to inapposite case law involving administrative **seizures** and ask the

Court to evaluate the constitutionality of Defendants' conduct by determining whether it was

"reasonable" without regard to Defendants' failure to obtain a warrant.

---

[3] Examples of closely regulated business include mining, *Donovan*, 452 U.S. at 597, firearms dealing, *United States v. Biswell*, 406 U.S. 311 (1972); automobile junkyards, *Burger*, 482 U.S. at 701, liquor-selling, *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 77 (1970), and commercial trucking, *United States v. Mitchell*, 518 F.3d 740, 751 (10th Cir. 2008).

In taking this position, Defendants seriously misconstrue the scope of *Santana v. City of Tulsa*, 359 F.3d 1241, 1243 (10th Cir. 2004), *Freeman v. City of Dallas*, 242 F.3d 642 (5th Cir. 2001), and *Edmundson v. City of Tulsa*, 152 F. App'x 694 (10th Cir. 2005).[4] These cases address the constitutionality of a warrantless seizure of private property that may result from a nuisance abatement proceeding. In all of these cases, the plaintiffs received ample notice of the abatement proceeding before their property was seized by the government. Furthermore, none of these cases undermine the longstanding rule that warrantless administrative **searches** "represent the exception rather than the rule." *V-1 Oil Co. v. Wyoming, Dep't of Environment Quality*, 902 F.2d 1482, 1486 (10th Cir.1990) (internal citation omitted).

It is well-established that a warrantless regulatory search is unconstitutional unless the "closely regulated business" exception or some other exception applies.[5] *Id.* at 1485; *Mimics, Inc. v. Vill. of Angel Fire*, 394 F.3d 836, 847 (10th Cir. 2005) (it has "long been the rule" that statutes authorizing nonconsensual warrantless searches of commercial property at any time and under any circumstances violate the Fourth Amendment).

Unfortunately, because Defendants never discuss the "closely regulated business" exception, the Court is in the position of trying to shoehorn Defendants' arguments into a discussion of the applicable case law. For example, Defendants contend their warrantless "administrative" inspection of Plaintiff's gallery was constitutional because they are authorized to enforce Albuquerque fire and housing codes. It is possible Defendants intend to suggest that

---

[4] Defendants also cite *Platteville Area Apt. Ass'n v. City of Platteville*, 179 F.3d 574 (7th Cir. 1999), a case involving a challenge to a city ordinance permitting the inspection of buildings for housing code violations in accordance with a "special inspection warrant." *Id.* at 577. *Platteville* does not involve a warrantless administrative inspection or otherwise question the general rule that warrantless searches are unreasonable.

[5] Defendants do not contend that any other exception to the warrant requirement applies. To the contrary, Defendants specifically agree that they are not arguing that exigent circumstances necessitated the search of Plaintiff's gallery and residence. Reply at 3.

the Albuquerque fire and housing codes constitute the sort of regulatory scheme that supplants

the warrant requirement under *Burger*. If this is their argument, the Court notes that it is clearly

precluded by Tenth Circuit precedent:

> The only warrantless administrative searches which have been upheld are those
> conducted pursuant to narrow statutes which regulate particular industries.
> Administrative searches conducted pursuant to statutes of general applicability require
> search warrants.

*V-1 Oil Co.*, 902 F.2d at 1487 (internal citations omitted). In other words, it remains good law

that a business owner has a "constitutional right to insist that [a] fire inspector obtain a warrant"

prior to conducting an administrative search. *See v. Seattle*, 387 U.S. 541, 546 (1967). Given the

numerous cases affirming a business owner's right to be free from warrantless searches unless

the business owner operates within a heavily regulated industry, the Court finds that no

reasonable officer in Defendants' position could conclude that Defendants' conduct constituted a

reasonable warrantless search. For this reason, Defendants are not entitled to qualified immunity

on Plaintiff's Fourth Amendment claim.

> ii.      **Was the Search Valid under *Burger*?**

Because the Court concludes that Plaintiff's art gallery was not a closely regulated

business, the Court is not required to address whether Defendants' warrantless search satisfied

the three-part test for a valid warrantless search of a pervasively regulated business. However,

the Court will briefly note that Defendants' conduct presents problems in this regard. To be valid

a warrantless search of a closely regulated business must (1) be conducted in accordance with a

regulatory scheme that is informed by a substantial government interest, (2) be necessary to

further the regulatory scheme, and (3) be accompanied by a constitutionally adequate substitute

for a warrant, in the form of the certainty and uniformity of the application of the regulatory

scheme. *United States v. Mitchell*, 518 F.3d 740, 751 (10th Cir. 2008) (citing *Burger*, 482 U.S. at

17

703). "To satisfy the 'adequate substitute for a warrant' requirement, a regulation must sufficiently inform the commercial property owner that his property will be subject to periodic inspections undertaken for specific purposes, must notify owners as to who is authorized to conduct an inspection, and must limit the discretion of inspectors in time, place, and scope." *United States v. Johnson*, 408 F.3d 1313, 1320 (10th Cir. 2005) (internal citation omitted).

Here, Defendants claim they had the right to inspect Plaintiff's building without obtaining a warrant because they are authorized to enforce city codes and ordinances, including the housing code and the fire code. This claim appears to be unfounded. The Albuquerque housing code[6] does not permit warrantless searches: § 14-3-5-9 of the housing code requires a building inspector to "first present proper credentials and request entry" if a building is occupied. If entry is denied, the inspector must "obtain a search warrant or other appropriate legal authorization" before proceeding with the inspection. *Id.* The Albuquerque fire code contains an equivalent provision.[7] Unsurprisingly, Defendants neglect to cite or discuss either of these provisions.

Instead, Defendants talk generally of their enforcement authority and cut and paste city ordinance § 14-2-3 into Exhibit C to their Motion. This ordinance states that the Fire Marshal's Office has jurisdiction to "test and inspect fire suppression systems, including fire hydrants, fire extinguishers, fire alarms and sprinkler systems." It does not in any way limit the discretion of the Fire Marshal's Office to determine what time of day it will conduct inspection or how often it

---

[6] There is a link to the Albuquerque Code of Ordinances on the city website: http://www.cabq.gov/planning/publications.
[7] Albuquerque has adopted the 2009 Edition of the International Fire Code as the city fire code with certain amendments. *See* Albuquerque Code of Ordinances § 14-2-1 & 14-2-4. According to these amendments, if a building is occupied the "fire code official shall present credentials to the occupant and request entry." If entry is denied, the fire code official must "proceed to obtain a search warrant." A copy of this amendment, Exhibit A to Enactment No. 2012-029, is available on the Fire Marshal's website: http://www.cabq.gov/fire/our-department/fire-marshals-office, under the link labeled "Fire Code." The section concerning right of entry just quoted is § 104.3.

18

will conduct inspections. Suffice it to say that the breadth of § 14-2-3 is problematic. The Tenth Circuit has clearly explained that a statute does not provide an adequate substitute for a warrant if it "leaves inspectors free to inspect any business as often or seldom as he or she pleases." *V-1 Oil Co.*, 902 F.2d at 1487.

Defendants' failure to identify an ordinance that explicitly authorizes the warrantless search of Plaintiff's business bolsters the Court's conclusion that Defendants are not entitled to qualified immunity. No reasonable officer would believe he or she possessed complete discretion to search a local business for housing or fire codes violations, at any time of night, in the absence of a history of regular inspections, and in contravention of portions of the housing code and fire code requiring consent or the acquisition of a warrant. The Court will allow Plaintiff's Fourth Amendment claim to proceed to the jury.

## III.     Fourteenth Amendment

Plaintiff also asserts a Fourteenth Amendment due process claim based on Defendants' decision to post Plaintiff's building as substandard and order that it be evacuated (1) without a prior hearing and (2) "despite a lack of evidence or justification which warranted the seizure prior to a hearing." Response at 24. The first component of Plaintiff's claim involves Plaintiff's procedural due process rights, while the second component involves Plaintiff's substantive due process rights. The Court will address each claim in turn.

### A.  Procedural Due Process

The Tenth Circuit has adopted a two-step inquiry for determining whether an individual's procedural due process rights have been violated: "(1) Did the individual possess a protected property interest to which due process protection was applicable? (2) Was the individual afforded an appropriate level of process?" *Camuglia v. City of Albuquerque*, 448 F.3d 1214,

1219 (10th Cir. 2006). Defendants do not dispute that Plaintiff had a protected property interest in his gallery and residence; the only question facing the Court is whether Plaintiff was entitled to a hearing prior to the seizure of his building.

In general, "one who has a protected property interest is entitled to some sort of hearing before the government acts to impair that interest." *Id.* at 1220. However, a pre-deprivation hearing is not constitutionally required where "the necessity of quick action by the State. . . [is] coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking." *Hudson v. Palmer*, 468 U.S. 517, 531-532 (1984). The quintessential situation in which a pre-deprivation hearing is unnecessary involves the state acting to protect public health and safety. S*ee Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 299-300 (1981) (upholding a statute under the emergency exception to procedural due process because of the need for swift action to protect public health and safety); *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 679 (1974) ("[D]ue process is not denied when postponement of notice and hearing is necessary to protect the public from contaminated food . . ."). It has long been the case that courts confer "the states great leeway in adopting summary procedures to protect public health and safety." *Mackey v. Montrym*, 443 U.S. 1, 17 (1979).

For example, in *Camuglia*, the Tenth Circuit upheld an Albuquerque ordinance that permitted health inspectors to immediately suspend the operation of a food-service or food-processing operation if the inspection found an "imminent health hazard or other conditions . . . which . . . constitute a substantial hazard to the public health." *Camuglia*, 448 F.3d at 1219, 1221. Similarly, other circuits have held "that the emergency evacuation of tenants from a dangerous and potentially life-threatening structure qualifies as an 'extraordinary situation'" that

20

justifies action without a pre-deprivation hearing. *Grayden v. Rhodes*, 345 F.3d 1225, 1237 (11th Cir. 2003); *see also Flatford v. City of Monroe*, 17 F.3d 162, 167, 168 (6th Cir. 1994) (explaining that a "prior hearing is not constitutionally required where there is a special need for very prompt action to secure an important public interest . . . " and approving of the following ordinance: "If the building or structure is in such condition as to make it immediately dangerous to the life, limb, property or safety of the public or its occupants, it shall be ordered to be vacated.").

In light of this precedent, it is clear that Albuquerque inspectors may order that a building be evacuated to protect the health and safety of the public without first providing a hearing to the individual in possession of the building. This is exactly what happened in this case.[8] Albuquerque ordinances § 14-3-4-1 et seq. define the conditions that make a building substandard. Once the building has been marked substandard, § 14-3-5-3 requires city officials to "commence proceedings to cause the repair, rehabilitation, vacation, demolition or securing of the building." § 14-3-5-3 also delineates the standards city officials must follow in deciding what course of action to pursue. According to these standards, "[i]f the building or structure is in such condition as to make it immediately dangerous to the life, limb, property or safety of the public or of the occupants, it shall be ordered to be vacated." *Id.*

Plaintiff suggests that this provision of the Albuquerque housing code is inconsistent with another provision allowing for immediate appeals. Response at 25. § 14-3-5-4 (D) of the Albuquerque housing code stays the effect of an order to vacate during the pendency of an appeal. In other words, if Plaintiff had appealed Defendants' decisions to post Plaintiff's building

---

[8] Plaintiff contends that Defendants' behavior violated the due process clause because Defendants "acted without legal authority." Response at 29. While it would have been better for Defendants to specifically identify the portion of the Albuquerque housing code that authorizes the evacuation of substandard buildings, there is such a provision, § 14-3-5-3, and Plaintiff has not presented any evidence disputing Defendants' contention that they were authorized to enforce the Albuquerque housing and fire codes.

as substandard and to order Plaintiff to vacate the premises, Plaintiff would have been able to immediately reenter the building. The Court acknowledges that the City's willingness to allow property owners complete discretion to reopen buildings determined to be immediately dangerous is unusual. Nonetheless, Defendants are entitled to summary judgment on Plaintiff's procedural due process claim as long as Defendants reasonably believed it was constitutional to close Plaintiff's building without holding a pre-deprivation hearing.[9] Plaintiff has not identified any case law which could undermine Defendants' confidence in their power to evacuate dangerous buildings in accordance with § 14-3-5-3 of the Albuquerque housing code.

Plaintiff largely sidesteps this issue by framing the issue as whether Defendants violated his due process rights by closing his building for minor code violations. In other words, Plaintiff denies that the building was in a dangerous condition. However, even if Plaintiff is able to persuasively challenge the wisdom of Defendants' decision, "[t]he process one is due is not dependent on whether the government was right or wrong in the particular case but on whether, in general, constitutional norms require particular procedures to balance private and public interests." *Camuglia*, 448 F.3d at 1222. The Court will dismiss Plaintiff's procedural due process claim with prejudice.

---

[9] The Court notes that Plaintiff never directly argues that Defendants violated the procedural portion of the due process clause by failing to provide adequate post-deprivation process. Plaintiff's affidavit alludes to this issue; Plaintiff testifies that he was never notified of his right to appeal the decision to rate his building substandard. Moore Affidavit ¶¶ 51-52, 59-60. However, it is not clear if Plaintiff contends that Defendants' were personally and individually responsible for the lack of notice. The Court presumes that Plaintiff is not asserting such a claim against Defendants' because Plaintiff never discusses this issue in the briefing. If the Court has misconstrued Plaintiff's position, Plaintiff is free to file a motion to reconsider.

### B.  Substantive Due Process

Plaintiff's challenge to Defendants' decision to post his building as substandard is better characterized as a claim under the substantive portion of the due process clause. Substantive due process requires that the termination of a protected interest not be "arbitrary, capricious, or without a rational basis." *Curtis v. Oklahoma City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1215 (10th Cir. 1998). In other words, an official may not evade the pre-deprivation hearing requirements of the due process clause by expediently and arbitrarily invoking an emergency procedure without cause. *Camuglia*, 448 F.3d at 1222; *see also Armendariz v. Penman*, 31 F.3d 860, 866 (9th Cir. 1994) ("[T]he rationale for permitting government officials to act summarily in emergency situations does not apply where the officials know no emergency exists, or where they act with reckless disregard of the actual circumstances.").

An official decision is "arbitrary" in the constitutional sense if it "shocks the conscience of federal judges." *Camuglia*, 448 F.3d at 1222. Mere negligence is insufficient. *Id.* "To show a defendant's conduct is conscience shocking, a plaintiff must prove a government actor arbitrarily abused his authority or employed it as an instrument of oppression. The behavior complained of must be egregious and outrageous." *Hernandez v. Ridley*, 734 F.3d 1254, 1261 (10th Cir. 2013) (internal citations omitted). A court must be particularly deferential when reviewing a decision to take prompt action to protect public safety. "If an official believes that the public is in immediate danger, he or she should not hesitate to invoke an emergency procedure for fear of being sued, and being liable for damages should his or her decision turn out to be incorrect in hindsight." *Catanzaro v. Weiden*, 188 F.3d 56, 63 (2d Cir. 1999).

Here, Defendants identified various fire code violations allegedly committed by Plaintiff, some of which were presumably corrected by the dissolution of the party, *e.g.* overcrowding.

Unfortunately, in the materials provided to this Court, Lieutenant Turpen never specifies which of the more permanent violations were crucial to his decision to post Plaintiff's building as substandard. After listing a variety of violations, Lieutenant Turpen's affidavit concludes:

> Plaintiff was cited for the following violations: improper use of building, permit shall be posted, lack of clearance for ignition sources, electrical hazards, extension cord use, improper decorations, failure to service fire extinguisher, exit door violations, and further egress violations, including but not limited to, failure to have illuminated exit signs. The building was posted as substandard. . . . Based on my training and experience, I used my discretion to determine that the above discussed issues presented immediate health and safety dangers to Plaintiff and his patrons.

Turpen Affidavit ¶¶ 44, 46. As Plaintiff points out, several of the issues identified by Lieutenant Turpen were temporary and easily correctable, *e.g.* the removal of the decorations, or were immediately corrected by Plaintiff at the time of the inspection, *e.g.* the extension cord violations.

Moreover, in addition to disputing Lieutenant Turpen's assessment of the property, Plaintiff has produced evidence that the decision to post his building as substandard was a pretext. First, Defendants permitted Plaintiff to remain in the building on the night of October 28, 2011. In other words, Defendants delayed the order to vacate the building, which was according to their testimony an immediate threat to Plaintiff's safety. Second, Defendants' decision to post the building as substandard was not the result of a random inspection. Defendants entered Plaintiff's gallery for the purpose of closing his party after hearing loud music and seeing people congregating outside. It appears that Defendants entered Plaintiff's business with the intent of finding violations and preventing Plaintiff from resuming his party. Third, Plaintiff has testified that Lieutenant Turpen stated he did not realize he was shutting down an art gallery and would not have shut Plaintiff down if he had known this fact. Moore Affidavit ¶ 73.

24

These facts certainly raise questions about Defendants' decision to post Plaintiff's building as substandard and order its evacuation. Nonetheless, even viewing the evidence in the light most favorable to Plaintiff, the Court cannot say that Defendants' behavior was so egregious and outrageous that it would shock the conscience of a federal judge. Lieutenant Turpen, an Albuquerque Fire Marshal Inspector at the time of the incident, identified flaws in the water heater and wiring that he considered to be a fire hazard. Plaintiff has not produced any evidence that would contravene Lieutenant Turpen's assertion that the water heater and wiring posed a fire danger.[10] The Court will dismiss Plaintiff's substantive due process claim.

## IV.   Malicious Prosecution

Count III of Plaintiff's complaint asserts a claim for "malicious abuse of process." Defendants interpreted this claim as a § 1983 malicious prosecution claim and moved for summary judgment on this basis. Motion at 20-21. In the Response, Plaintiff agrees that he does not have a § 1983 malicious prosecution claim, but characterizes his Count III claim as a New Mexico state law claim, for which there is no qualified immunity defense. However, Defendants' reply does not discuss the elements of a state law malicious prosecution claim. Because the parties have not provided any briefing on the issue of New Mexico malicious prosecution claims, the Court is not in a position to rule on this issue. The Court will deny Defendants' request for summary judgment on Plaintiff's New Mexico malicious prosecution claim as premature because the issue is undeveloped.

IT IS THEREFORE ORDERED THAT:

1.   DEFENDANTS' MOTION AND MEMORANDUM IN SUPPORT OF THEIR

MOTION FOR SUMMARY JUDGMENT REQUESTING DISMISSAL OF

---

[10] Plaintiff did testify that his building "had full wiring inspection and a new fuse box." Moore Affidavit ¶ 64. But he does not state when this inspection occurred.

PLAINTIFF'S COMPLAINT ON QUALIFIED IMMUNITY GROUNDS (Doc. No. 21) is granted in part and denied in part.

2.  The Court will dismiss Plaintiff's Count II due process claim with prejudice.


_____
SENIOR  UNITED  STATES  DISTRICT  JUDGE